PEOPLE v. PUTNAM.

(Supreme Court, Appellate Division, First Department. January 15, 1904.)

1. LARCENY—FALSE PRETENSES—EVIDENCE—SUFFICIENCY—PRINCIPALS.

Pen. Code, § 528, makes it larceny to deprive one of money by any fraudulent or false representation or pretense; section 530 provides that it is grand larceny in the first degree to unlawfully obtain property to the amount of more than $500; and section 29 provides that a person concerned in the commission of a crime, whether he directly commits the criminal act, or aids or abets in its commission, is a principal. Prosecutor, having answered an advertisement for a party with capital, received a call from a man who stated that he had located a mining engineer who had some mining stock, of the value of which the engineer was ignorant, not knowing that there had been a rich find of ore, and that the caller believed that the stock could be bought, and sold to the mining company at a profit. Prosecutor called at the company's office and saw the secretary and president, and the latter stated that he would pay a certain sum for stock of an engineer to whom it had been issued. The caller and prosecutor visited the engineer, and prosecutor secured an option on the stock. Thereafter the secretary told prosecutor that it was all right, and that the president would buy the stock if prosecutor would produce it. Prosecutor bought it, but the president and caller immediately disappeared. The stock was in fact of little or no value. There had been no rich find of ore, and the company was not in position to buy any stock. *Held*, that all the parties were guilty of grand larceny in the first degree.

2. SAME—EVIDENCE OF SIMILAR CRIME.

In a prosecution against the "engineer," it was proper, as bearing on the question of intent, to receive evidence of an exactly similar transaction, whereby prosecutor's caller and the secretary and president had defrauded another person, though defendant in that instance did not appear to have been directly connected with the transaction.

3. SAME—CONSPIRACY—LARCENY—DECLARATION OF PRINCIPALS.

Where the evidence in a prosecution for larceny showed that defendants were guilty of grand larceny, accomplished by a fraudulent combination between them, a contention that it was error to admit their conversations, not in the presence of their victim, on the ground that the evidence did not show a conspiracy, as defined by Pen. Code, § 168, was untenable; the declarations of each being competent evidence against the others.

4. SAME—EVIDENCE OF COMBINATION—ORDER OF PROOF—HARMLESS ERROR.

Though proof of declarations of an alleged co-conspirator may not be properly admissible when introduced in evidence, because community of

¶ 4. See Criminal Law, vol. 14, Cent. Dig. § 1013.

design has not been established, the error is cured by the subsequent introduction of proof of the existence of the conspiracy at the time the declarations were made.

Appeal from Trial Term, New York County.

Thomas Putnam was convicted of grand larceny in the first degree, and he appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Max D. Steuer, for appellant.

Robert C. Taylor, for respondent.

INGRAHAM, J. The defendant was indicted for grand larceny in the first degree. He was duly convicted, and the main question upon this appeal is whether the proof justified that conviction.

Section 528 of the Penal Code provides that a person is guilty of larceny, who, "with the intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person, either (1) takes from the possession of the true owner, or any other person; or obtains from such possession by color or aid of fraudulent or false representation or pretense, or of any false token or writing; or secretes, withholds, or appropriates to his own use, or that of any person other than the true owner, any money, personal property, thing in action, evidence of debt or contract, or article of value of any kind." Section 530 provides that a person is guilty of grand larceny in the first degree "who steals or unlawfully obtains or appropriates in any manner specified in this chapter * * * property of the value of more than five hundred dollars, in any manner whatever."

There were three other persons joined in the indictment, but this defendant was tried separately. There is no question raised as to the sufficiency of the indictment, and the first question presented is whether the evidence offered by the people justified the submission of the question of the defendant's guilt to the jury. Section 29 of the Penal Code provides that a person concerned in the commission of a crime, whether he directly commits the act constituting the offense, or aids or abets in its commission, is a principal.

The story told by the witnesses for the prosecution, and upon which this conviction is based, is as follows:

One Louis Franke on February 28, 1902, saw an advertisement in a newspaper, in which it was stated that a party with $4,000, ready cash, was wanted, who could make $12,000 inside of a week; "no scheme; strictly legitimate business transaction; will bear thorough investigation; must act immediately; no brokers; principals only." Franke answered that advertisement. In response to his letter, a man who gave his name as Herbert called upon Franke, produced Franke's letter, and handed him a prospectus of a Horseshoe Copper Mining Company. Upon Franke's stating that he did not wish to have anything to do with the mining scheme, Herbert read to Franke a letter which he claimed to have received from his brother, who

85 N.Y.S.—67

was employed by this company in Arizona. In this letter it was stated that a valuable vein had been struck, and the company was anxious to buy some of their own stock back; that a certain engineer, who had received 2,000 shares for services rendered, had come East, and Herbert was requested to find out where the engineer resided; that Herbert had located the engineer in the Everett House, New York City; that, this engineer not knowing anything about the heavy vein they had found, it was thought he could buy the stock at a reasonable price, and it could then be sold to the company at $14 or $15 a share, and the profits could be divided between his brother and Franke. This was on March 6, 1902.

Herbert again saw Franke on the following day, whereupon Franke went to the office of the Horseshoe Copper Mining Company, but, not seeing anybody, went again on the 8th. On that day he saw one "Weller," whose name appeared on the door as treasurer of the company. Weller introduced Franke to one Quealey, who was president of the company. Franke said to Quealey that he had been told that he had a controlling interest in the Horseshoe Copper Mining Company. To that Quealey said, "No;" that he used to have a controlling interest, but when he turned over this mine to the company he was compelled to deliver the company free and clear of all indebtedness, and, to do so, he had to pay some indebtedness. To accomplish that, he issued 1,000 shares of stock to one man, and 2,000 to another man—a mining engineer—for services rendered; that the 1,000 shares had all been repurchased, but they were unable to locate the 2,000 shares. Franke then asked Quealey, if he (Franke) could control all or a part of those shares, at what price he was willing to purchase them, to which Quealey replied, "I buy my stock for $15 and some for $16, but I want to make something, and I will offer you $14." Franke then asked Quealey if he would give a certified check at the time the shares were delivered, and he said, "Yes;" that he was not ready on that day, but would be ready on Monday, to purchase the stock.

After the conversation of the 8th of March, Herbert again called on Franke, and Franke repeated the conversation that he had with Quealey. Herbert then wanted Franke to call at the Everett House to be introduced to the engineer, and made an appointment for Franke to meet Herbert at the Everett House at 4 o'clock in the afternoon of Sunday, March 9th. When Franke got to the Everett House he found Herbert standing by the door, and took him at once up to a room on the first floor. When they went into the room, Franke found the defendant lying on a bed, apparently sick. His hands were bandaged with iodine, and medicine bottles were on the table, and his arms were bandaged. He had on a bath robe. Herbert introduced Franke to the defendant as an engineer by the name of Putnam, and told Putnam that Franke was willing to buy the stock. Herbert said to the defendant, "Mr. Putnam, this gentleman is intending to purchase your stock, and how much you take for them;" and to that Putnam replied that he wanted $12 a share, but that he was so sick he did not care to talk business or to sign for them, and "he thinks he can get a good deal more from a man who comes from Chicago." He said he

was very sick with sciatica, and was in great agony. Franke said he was sorry, and did not want to trouble Putnam, as he was so very sick; and Herbert said: "No; sit down; sit down. We will figure now— make a price for the stock." Franke then proposed to place these shares in a bank, or with a trusted friend, and that he (Franke) would put up the amount of money, and if the thing was all right, and an honest deal, Putnam was to take his money, and Franke the shares. Putnam said, "No;" that he had been fooled twice already with checks; that he was a stranger here, and did not want to bother with checks, and would not take anything else but money. It was then agreed that the defendant was to sell the shares for $10 a share. In the course of this conversation the defendant said he was an engineer, and had received this stock for services rendered as engineer to the Horseshoe Copper Mining Company.

Herbert and Franke then left the hotel, and on Monday morning Franke went to the office of the company, and there saw Quealey, who said that the party for whom he was buying the stock had not yet arrived. Then Herbert again appeared, and took Franke up to the Everett House to see the defendant. They arrived there about 11 o'clock on Monday, and Herbert asked the defendant whether he had the shares with him. The defendant lifted himself up with apparently great pain, and took from under the mattress two certificates of stock —one for 800 shares, the other for 1,200. These certificates stood in the name of "Thomas Putnam," were dated September 12, 1901, and were signed by Quealey as president, and Weller as treasurer, of the corporation. Herbert then proposed that the defendant give option on the whole 2,000 shares at $10 a share; and Franke, at the dictation of Herbert, wrote out such an option, and the defendant signed it, Herbert signing as a witness.

After Franke had got that option, he went back to the office of the mining company and saw Weller. Weller said that Quealey had just left; leaving word for Franke that it was all right; directing Franke to bring the shares, and that he would get his money. On the following day Franke saw Herbert, repeated the conversation that he had had with Weller, but said that he could not purchase the 800 shares, because he had only $4,000, and that $8,000 was required. Herbert then said he would telegraph to his brother to wire $4,000, and would telephone Franke about it. About 9 o'clock that night Franke received a telephone message at his house from Weller that he had received from his brother a telegram stating that the $4,000 had been telegraphed by the Western Union Telegraph Company.

On Tuesday, the 11th of March, Herbert came to Franke's office and said, "Well, you draw your money, and I have to go up to Twenty-Third street, to the Western Union Telegraph office, with a gentleman who will identify me, to receive the $4,000," and that he would meet Franke at the Everett House at about 11 o'clock. Franke thereupon drew $4,000 in bills from the bank, and went to the Everett House; arriving there shortly after 11 o'clock. He met Herbert at the door. Herbert said: "All right. I have got my money." They went upstairs into the defendant's room. The defendant was then in bed, dressed the same as before—still apparently very sick. Herbert asked

the defendant if he had the 800 shares of the Copper Mining Company, whereupon the defendant produced the certificate from behind the mattress; and, when produced, the blank assignment on the back of the certificate for 800 shares was signed by the defendant. The defendant then handed to Franke the certificate, and Herbert at the same time said, "Here is my money, and Mr. Franke will give you his money," and reached over to the defendant, apparently handing him something. Franke looked at the certificate, and then handed the defendant $4,000 that he had drawn from the bank. Franke then wrote out a receipt for the money, which the defendant signed. This receipt was for the $8,000, the consideration for the 800 shares of stock.

Herbert and Franke then went down to the company's office. When they arrived, there was no one in the office, except a typewriter. Herbert and Franke waited an hour and over, when Herbert said it was very queer that Quealey should not be there. Franke then became very suspicious, and told Herbert that he certainly would not lose sight of him. Franke and Herbert waited about three hours, and Quealey did not appear. Then Herbert said he wished to go to the toilet room, took off his coat, and left it on the office table. Franke wanted to go with him to the toilet room, but the typewriter said that he would not run away, because his coat and hat were there, whereupon Herbert went to the toilet room, but did not return. Franke then insisted upon taking Herbert's coat, but before he took it the typewriter carefully looked through the pockets to find if he had not left something in it for her. Franke took the coat to another office in the building, and left it there, and went to the Everett House to look for the sick engineer. He got to the Everett House about 4 o'clock in the afternoon, but the defendant had gone, leaving word with the clerk that he was going to a hospital.

Franke then returned to the office of the company, and met Weller, who said that he was very glad indeed that Franke had got the stock, and he would transfer his stock to Franke on the books of the company. That did not seem to satisfy Franke, and he kept hold of the certificate that he had received from the defendant. He was subsequently unable to see Quealey, and Quealey never produced the stock, or any one that was ready to purchase it. As soon as they got the $4,000 from Franke, they lost all interest in the stock.

None of these facts were denied. The people also proved that the stock was of little or no value; that the company was not at the time in a position to purchase any stock; that no rich strike had been made. It requires only a mere statement of this story to make it entirely clear that there was here nothing but a device to palm off this worthless stock upon Franke, or any one that would answer that advertisement, by leading him to believe that he could resell the stock to either Quealey or the company at a price in excess of that paid, when there was not the slightest intention of purchasing it. We think it entirely clear that all of the parties who took part in this scheme were guilty of grand larceny, and the conviction was amply sustained by the evidence.

The defendant, upon the trial, objected to the introduction of the

conversations between Herbert, Quealey, and Weller, upon the ground that as to him they were mere hearsay, as they were not in his presence. We think the evidence was clearly admissible; that the facts showed a combination or conspiracy between these four persons to obtain Franke's money by trick and device, and the evidence of the combination between them was so connected with the crime that the admissions or declarations of each of the co-conspirators were evidence against the defendant.

The appellant claims that the proof was not sufficient to convict the defendant of a conspiracy, as defined by section 168 of the Penal Code. This was not an indictment for a conspiracy under that section, but an indictment for grand larceny; and, the crime having been committed, each of the parties who was concerned in the commission of the crime, whether he directly committed the act constituting the offense, or aided or abetted in its commission, is a principal, under section 29 of the Penal Code. That each one of the four was directly engaged in the commission of the crime is clear, and thus the acts or declarations of each of those engaged were admissible against either of the others. We think the relation that each of these four persons bore to the others was sufficient to justify the court in finding as a fact that there was a combination between them to defraud Franke out of his money, and that the declarations of each were competent evidence against one of those jointly engaged in consummating the crime. It is quite probable that, when some of the conversations with Herbert and Quealey were admitted, the people had not then proved facts sufficient to justify the inference that the defendant was an actor in this conspiracy; but the subsequent evidence was sufficient to connect the defendant with the scheme, and his objection to the admission of the evidence became then unavailing. The rule is stated in 6 Am. & Eng. Enc. of Law (2d Ed.) 869, as follows:

"Although proof of the acts and declarations of an alleged co-conspirator may not be properly admissible at the time when introduced in evidence, for the reason that community of intent and design has not been established, yet, if such evidence is received, the error may be cured by the subsequent introduction of proof of the existence of the conspiracy at the time the alleged declarations were made. This is in accordance with the rule of evidence which provides that testimony which is incompetent when offered and admitted may nevertheless be rendered competent, and the irregularity of its admission cured, by the subsequent introduction of proof which, had it preceded the evidence incompetent pro tempore, would have rendered such evidence properly admissible when offered."

The people also introduced in evidence a similar transaction by which these parties united in obtaining the money of another person, who had also answered this advertisement, and by which Herbert, Quealey, and Weller successfully employed the same methods to induce one Efinger to part with his money in the purchase of stock of this corporation. Again they produced the sick engineer, told to their victim the same story, and successfully obtained from him several thousand dollars. It is true that Putnam, the defendant in this case, does not seem to have been connected directly with the transaction, but this other transaction was in progress at the same

time that the defendant was disposing of his stock to Franke. The
sick engineer in that case was called "Even H. Clark." Efinger
answered this advertisement. He was waited upon by Herbert. He
was introduced to Quealey and Weller by Herbert. Quealey agreed
to buy his stock. Efinger purchased the stock from Clark to sell
to Quealey, and, as soon as he had purchased the stock and Clark
had got the money, the other parties to the transaction promptly dis-
appeared. As the defendant in this case was acting as the sick en-
gineer to get Franke's money, and as another sick engineer was
needed to get Clark's money, of course the defendant was not di-
rectly connected with that transaction; but to sustain a conviction
the crime must be proved against the four parties united for that
purpose; and, to show the intent with which they acted, it was com-
petent to prove that at the same time they were pursuing a scheme
of a similar character by which they succeeded in getting from an-
other individual money by means of the same false and fraudulent
statements that had induced Franke to part with his money.

It is well settled that in cases of this kind, where the fraudulent
intent is an element of the crime, similar frauds of the same char-
acter, and closely connected in point of time, are competent evidence
to show the intent with which the crime was committed; and the mere
fact that they tend to prove an independent crime does not render
such evidence incompetent. It is competent to show the criminal
intent of the parties directly connected with the transaction which is
necessary to constitute the crime. To prove the defendant guilty,
the intent of the parties engaged in the combination to accomplish
that purpose was an essential element of the crime; and, to prove
that essential element, it was competent to show that at the same
time the parties who had conspired together to cheat Franke were
successfully conspiring to cheat another individual, using the same
device. I think this evidence was clearly competent.

There are many other objections to evidence scattered through this
record. We do not think any of them material, and if it could be
said, strictly speaking, that some questions were objectionable, the
answer to none of them could at all affect the merits of the case. This
defendant was clearly guilty. No one can read this record without
being thoroughly convinced that this whole transaction was a bold
scheme to entrap the unwary and defraud them of their money; and,
strange to say, considering the apparent fraud that was indicated all
through the transaction, it succeeded.

I do not think that there was any error that would justify us in
reversing the judgment, and it should be affirmed. All concur.

